USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: SEP 06 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PRESCHOOLS OF AMERICA (USA), INC,

    Plaintiff,

v.

NEW YORK CITY DEPARTMENT OF
EDUCATION, ET AL.,

    Defendants.

---

No. 17-CV-5027 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Preschools of America (USA), Inc. brings this action alleging due process, First Amendment, and equal protection violations by Defendants—the City of New York, the City's Department of Education ("DOE"), former DOE Chancellor Carmen Farina, DOE's head of contracts and purchasing, David Ross, and a John Doe official at DOE. Before the Court is Plaintiff's motion to amend its complaint, as well as Defendants' opposition along with their motion to dismiss the underlying complaint pursuant to Rule 12(b)(6). For the reasons that follow, Defendants' motion to dismiss is granted and Plaintiff's motion to amend is denied.

## BACKGROUND

### I.   Factual Background

According to Plaintiff's proposed second amended complaint ("PSAC") (Dkt. 29-3), it is a major provider of child-care services to children in New York City, as well as more specifically to the Chinese-American community.[1] Over 3,000 New York City schoolchildren are currently enrolled in its 20 schools. The company is owned by Ziming Shen, Jr. and his two minor brothers

---

[1] The proposed allegations are assumed to be true for the purposes of this opinion and order.

and has been in operation since 2003. Mr. Shen's parents—Ms. Xiaoping Fan and Mr. Ziming Shen, Sr.—previously owned the company. Ms. Fan and Mr. Shen, Sr. have 2013 federal felony convictions for embezzling funds related to their school network in the Eastern District of New York.[2]

Defendants are responsible for administering the City's Universal Pre-Kindergarten program ("UPK"). In December 2015, Defendants sought proposals from potential UPK child-care providers. In February 2016, Plaintiff submitted a proposal to be considered as a UPK vendor. At the time, approximately 700 children enrolled in Plaintiff's schools were eligible for UPK. Plaintiff had also applied to be a UPK vendor in 2014 and 2015, but had been rejected as a non-responsible vendor. In 2016, however, Defendant DOE forwarded Plaintiff provisional UPK acceptance letters for seven of its school sites. But on March 31, 2016, Plaintiff received notification that one of its schools was being rejected because it did not meet quality thresholds. Plaintiff alleges that such a finding contradicted the statements of DOE representatives who had visited the school in question. On April 12, 2016, Defendant DOE notified Plaintiff that three more of its seven schools did not meet demand thresholds for their respective geographic areas. Plaintiff alleges that other nearby schools did receive UPK contracts. Plaintiff lodged a formal protest. Meanwhile, on May 24, 2016, DOE requested that Plaintiff show cause why it should not be deemed a "non-responsible vendor" for UPK purposes, which would make it ineligible for UPK contracts. PSAC at 13. On June 1, 2016, Plaintiff submitted documents in an effort to demonstrate

---

[2] The Court takes judicial notice of Ms. Fan's and Mr. Shen, Sr.'s 2013 criminal convictions. *See, e.g., Smith v. City of New York*, No. 12-CV-4572 (KPF), 2013 WL 6158485, at *1 (S.D.N.Y. Nov. 25, 2013).

that it was in fact a responsible vendor. On June 10, 2016, in a process distinct from the consideration of whether Plaintiff was a responsible UPK vendor, a DOE protest officer rendered a written decision in support of DOE's denial of the four schools.

In a September 1, 2016 letter, Plaintiff sought a decision from DOE on its responsible-vendor status. The letter criticized DOE for awarding contracts to vendors with records of misconduct but not Plaintiff, and asserted that DOE's conduct "raised serious questions and concerns as to whether [it was] . . . being fairly and even handedly treated[.]" *Id.* at 14. Plaintiff alleges that Defendants continued to delay rendering a decision until Plaintiff served them with a petition in October 2016 for a New York State Article 78 proceeding.[3] On November 14, 2016, DOE deemed Plaintiff to be a non-responsible vendor, making all its schools ineligible for UPK contracts. Plaintiff alleges that Defendants followed a similar pattern of delay in 2014 and 2015, and at the time of the complaint were in the process of similarly delaying for the 2017–2018 school year, while similarly situated schools and vendors continue to be awarded DOE contracts.

Plaintiff asserts that DOE's conduct towards its schools is motivated by its criticisms of various Defendants, much of it dating back nearly two decades and related to issues litigated at the time in Article 78 proceedings. Specifically, in addition to the criticism in the September 2016 letter and October 2016 petition, Plaintiff alleges that Ms. Fan criticized DOE and then-Community Superintendent, now-Defendant and former Chancellor, Carmen Farina in relation to the 2001 termination of various contracts with schools run by Ms. Fan. In particular, Ms. Fan rallied approximately 500 parents and students, mostly Chinese immigrants, to protest DOE's

---

[3] Plaintiff discontinued the Article 78 proceeding without prejudice and without an adjudication on the merits of the UPK contract denial.

conduct and claim discrimination against the Chinese-American community. Plaintiff alleges that in 2002, as part of the same dispute, Defendant Farina called Ms. Fan and Mr. Shen, Sr. "a joke," said she would refuse to deal with them, and dismissed the rally as "a show." *Id.* at 21. Plaintiff also alleges that in 2002, New York state courts annulled DOE's "summary termination" of the contracts with Ms. Fan's schools and ordered DOE to consider the submission of one of Ms. Fan's schools on the merits. Plaintiff alleges that DOE has continued to deny the contracts of any entities associated with Ms. Fan—including Plaintiff, which began operating the following year. Ms. Fan staged another rally to protest DOE's conduct in 2004, at which speakers again alleged discrimination against the Chinese-American community. In 2013, as noted above, Ms. Fan and her husband were convicted of embezzlement related to their school network in federal court.

## II. Procedural Background

On July 5, 2017, Plaintiff brought this action pursuant to 42 U.S.C. § 1983 and filed an amended complaint on July 11, 2017. Defendants moved to dismiss the amended complaint and Plaintiff then moved for leave to file a second amended complaint, which Defendants opposed as futile.

Plaintiff's PSAC alleges that Defendants (1) violated the due process clause of the 14th Amendment by denying Plaintiff's liberty or property interests in "being free to compete for publicly funded vendor contracts on an equal footing with other similarly situated potential vendors in a fair and impartial manner" and "having any denial of a request to receive" a vendor contract be afforded due process, as well as by stigmatizing Plaintiff in its community; (2) violated the First Amendment by retaliating against Plaintiff for its criticism of DOE; and (3) violated the equal protection clause of the 14th Amendment by treating Plaintiff differently from similarly

4

situated vendors. *Id.* at 31–39. The PSAC asks for a declaration that Defendants are violating Plaintiff's rights, a permanent injunction prohibiting the violative conduct, and $7 million in monetary damages.

## LEGAL STANDARD

"The Court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). But amending "will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see* Fed. R. Civ. P. 10(c).

## DISCUSSION

### I. Procedural Due Process

#### A. Public Contracts

Plaintiff argues that Defendants deprived it of its interest "in being free to compete for publicly funded vendor contracts." PSAC at 34. Plaintiff also alleges that it was stigmatized in the community by Defendants' finding that it was a non-responsible vendor. Neither allegation adequately states a protected interest under the due process clause.

"Governmental action may be challenged as a violation of due process only when it may be shown that it deprives a litigant of a property or a liberty interest." *Gen. Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1453 (2d Cir. 1991). Courts evaluate first "whether plaintiffs possessed a protected liberty or property interest, and, if so, [] what process plaintiffs were due before they could be deprived of that interest." *Sealed v. Sealed*, 332 F.3d 51, 55 (2d Cir. 2003). "The existence and dimensions of property interests are defined by 'existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Gen. Elec. Co.*, 936 F.2d at 1453 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). A party "must have more than an abstract need or desire" for a property interest and "more than a unilateral expectation of it." *Roth*, 408 U.S. at 577. The party "must, instead, have a legitimate claim of entitlement to it." *Id.*

Here, Plaintiff has not demonstrated that it has a protected interest in its status as a mere applicant for public contracts. "[I]nvolvement in publicly-financed projects does not rise to the level of a property interest." *Eastway Constr. Corp. v. City of N.Y.*, 762 F.2d 243, 250 (2d Cir.

1985), *superseded by rule on other grounds*. Even when an entity that has long been a public contractor is precluded from such business and is effectively "put out of business," a challenge to the preclusion does not allege the deprivation "of any federally secured right." *Id.* at 246, 249. Nor is it established that such entities have a federal due process interest in the timely and impartial consideration of their applications. *Id.* at 250. The Circuit has repeatedly refused "to constitutionalize contractual interests" associated with nothing more than contractor status. *S&D Maint. Co., Inc. v. Goldin*, 844 F.2d 962, 967 (2d Cir. 1988); *see A.F.C. Enters. v. N.Y. City Sch. Constr. Auth.*, No. 98-CV-4534, 1999 WL 1417210, at *10–*11 (E.D.N.Y. June 29, 1999). And Plaintiff here is not even a contractor—it merely wishes to become one. In sum, "i[f] a party to a City contract has no protectible property interest, surely [Plaintiff] does not." *Empire Transit Mix, Inc. v. Giuliani*, 37 F. Supp. 2d 331, 335 (S.D.N.Y. 1999); *see John Gil. Constr., Inc. v. Riverso*, 72 F. Supp. 2d 242, 252 (S.D.N.Y. 1999). Plaintiff has thus failed to establish that the denial of its contract bids deprived it of a protected interest.

### B. Stigma Plus

As for a protected interest based on stigma—a so-called "stigma plus" claim—a plaintiff must allege "(1) the utterance of a statement about her that is injurious to her reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden . . . in addition to the stigmatizing statement." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (internal quotation omitted). "The state-imposed burden or alteration of status must be *in addition* to the stigmatizing statement. Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a

7

deprivation of a liberty or property interest protected by due process." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (citation omitted).

Even assuming that Plaintiff has adequately alleged that Defendants publicized a stigmatizing statement capable of being proved false, Plaintiff has not demonstrated the requisite state-imposed burden. Plaintiff's complaint asserts that Defendants' decision to classify it as a non-responsible vendor in the context of denying it a UPK contract has stigmatized it in the community, prevented "current and prospective clients" from placing their children in Plaintiff's care, caused parents to remove children, and might affect its ability to secure other government contracts. PSAC at 17, 34–35. Any such harms, however, are not "in addition to" the alleged stigma of being termed a non-responsible vendor, but rather are "the deleterious effects which flow directly from a sullied reputation," which are insufficient to give rise to a protected interest. *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994);[4] *see also Goldin*, 844 F.2d at 970. "[I]t is only when defamation is *coupled* with a statutory impediment to employment" that a stigma-plus claim is sufficiently stated. *Avello v. Hammons*, 963 F. Supp. 262, 268 (S.D.N.Y. 1997). Plaintiff has not alleged any such impediment.

If Plaintiff means to argue that the mere denial of its contract bid was itself the statutory impediment, that argument fails. The denial prevented Plaintiff only from receiving one specific

---

[4] In *Valmonte*, the Circuit found that the plaintiff had adequately stated a stigma-plus cause of action based on negative employment prospects, but only because of the "unique" statutory scheme governing persons listed on a child abuse database, which required private employers to consult with the government and submit a special justification before hiring any such person. 18 F.3d at 1002. Plaintiff has not alleged the existence of any comparable scheme here. Additionally, because the Court finds that Plaintiff was not deprived of a protected interest, it need not reach the issue of whether Plaintiff was afforded adequate due process.

8

type of work—that involving New York City's UPK program. Its non-UPK work appears from Plaintiff's own claims to have continued unabated. *See* PSAC at 4–5. The contract denial is thus categorically different from the sort of statutory impediment identified by the Second Circuit in *Valmonte*, in which potential employers were required to consult a central registry before hiring the plaintiff and explain in writing their reasons if they did so. 18 F.3d at 1002; *see Empire Transit Mix*, 37 F. Supp. 2d at 337.

Furthermore, Plaintiff has not come close to alleging that any stigma "foreclosed [its] freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573. Far from it. As noted, by Plaintiff's own estimation, it remains "the largest provider of child care services to children in the City of New York," "the largest child care provider to the Chinese-American community," had thousands of children enrolled in its schools last year, and "enjoys an excellent reputation in its community as a child day care and pre-school." PSAC at 4–5. Plaintiff's stigma-plus claim thus fails on multiple fronts.

The Court denies Plaintiff's leave to amend its procedural due process claims because such amendment would be futile, and dismisses those claims with prejudice.

## II. First Amendment Retaliation

Plaintiff next alleges that Defendants violated the First Amendment by retaliating against it for its various criticisms of their conduct over the years—namely the rallies and challenges against the DOE from 2001 to 2004, and the September 2016 letter and October 2016 petition. "A plaintiff asserting a First Amendment retaliation claim must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech."

9

*Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (internal quotation omitted). "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012). "A plaintiff can establish the causal connection between protected expression and an adverse employment determination indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir.2004) (internal quotation omitted).

Plaintiff's allegations fail to demonstrate a plausible causal connection either directly or indirectly. Even assuming that a contractor may state a free-speech-retaliation claim based on the denial of a bid, *see A.F.C. Enters. v. N.Y. City Sch. Constr. Auth.*, No. 98-CV-4534, 2001 WL 1335010, at *17 (E.D.N.Y. Sept. 6, 2001), Plaintiff's allegations are insufficient. The events Plaintiff alleges as the basis of its claim are attenuated, and scattered across nearly two decades. Plaintiff relies in large part on the various protests Ms. Fan made against DOE and Defendant Farina in 2001 and 2002—but these events occurred before Plaintiff even began operating in 2003, and were made by persons who resigned from the company in 2011. Even the 2004 protest occurred a decade before DOE found Plaintiff to be a non-responsible vendor in 2014.[5] There may be no precise "bright line" in this circuit as to the maximum length of time between protected

---

[5] Plaintiff appears to contend that Defendants' contract denials of any entities associated with Ms. Fan began in 2002 and continue to the present day, but offers no specific allegations of denials prior to DOE's alleged conduct in 2014.

10

behavior and alleged retaliation, but a decade is far too long. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001).

The only other possible free speech activity—the September 1, 2016 letter and October 2016 Article 78 petition—occurred midway through DOE's review process. By that point, a DOE protest officer had already issued a written decision supporting the rejection of four of Plaintiff's seven schools, and DOE had asked Plaintiff to "show cause why it should not be deemed a non-responsible vendor." PSAC at 13. Indeed, as Plaintiff notes, DOE had already found Plaintiff to be a non-responsible vendor for the prior two years. The notion that the 2016 non-responsible finding, or any ongoing refusal to award contracts to Plaintiff, "would not have been taken absent" the September letter or October petition strains credulity and does not state a plausible retaliation claim. And of course, it is impossible that either the letter or petition caused the 2014 or 2015 contract denials because neither yet existed.

Nor do Plaintiff's allegations of animus salvage its retaliation claim. In alleging a pattern of adverse actions, Plaintiff attempts to conflate events that took place at least 12 years apart. A pattern based on Defendant Farina's 2002 comments and contract denials starting in 2014 is not a pattern.[6] Furthermore, the initial, and arguably most substantial, adverse action—the termination of various city contracts with schools run by Ms. Fan—occurred in 2001, before Plaintiff alleges it engaged in any protected speech, or even existed as an entity. *See Glob. Network Commc'ns, Inc. v. City of N. Y.*, 507 F. Supp. 2d 365, 375 (S.D.N.Y. 2007) (finding that consistent conduct by a defendant both before and after a plaintiff's protected speech prevented speculation of the

---

[6] As noted above, any contract denial that may have occurred in the intervening years is merely alluded to, not described with any sufficient detail that might survive a 12(b)(6) motion.

11

defendant's retaliatory intent). And as discussed above, DOE's non-responsible vendor determination for Plaintiff in 2014 and 2015 was entirely consistent with its 2016 determination that followed the September letter and October petition. Even allowing for the fact that "motive and intent . . . are difficult to plead with specificity in a complaint" and "may be averred generally," *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994), the factual allegations here are simply too thin, and the time gap too wide, to sustain an animus-based retaliation claim. In other words, there is no reasonable inference to be made from the allegations presented that protected speech by Plaintiff was a "substantial motivating factor" in its treatment by DOE. Because Plaintiff has failed to credibly allege a causal connection, either directly or indirectly, between its disparate exercises of free speech and the failure to be awarded UPK contracts, leave to file such claims in a second amended complaint is denied as futile. Plaintiff has preemptively asked for further leave to amend this claim, but given that Plaintiff has already had multiple opportunities to make sufficient factual allegations, that request is denied and the retaliation claim is dismissed with prejudice.

### III. Equal Protection

Lastly, Plaintiff argues that its allegations state either a class-of-one or selective enforcement equal protection claim. Plaintiff alleges that DOE has awarded contracts and shown leniency to other vendors who have records of improper or unlawful behavior, and are thus similarly situated to Plaintiff. In contrast, Plaintiff argues, Defendants denied it contracts despite it being "operated by many professionals who have no criminal convictions" merely because it had "two former shareholders [(Ms. Fan and Mr. Shen, Sr.)] who were convicted of a crime that have divested their interests in the company." PSAC at 14.

"The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Brisbane v. Milano*, 443 F. App'x 593, 594 (2d Cir. 2011) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). A party that does not claim membership in a protected class may state an equal protection claim by demonstrating either selective enforcement or a so-called class-of-one. *Artec Constr. & Dev. Corp. v. City of New York*, No. 15-CV-9494 (KPF), 2017 WL 5891817, at *4 (S.D.N.Y. Nov. 28, 2017) To allege a claim of selective enforcement, plaintiffs must plead "both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (internal quotation omitted). To state a class-of-one claim, a plaintiff must likewise show different treatment from those similarly situated, and that such treatment lacked a rational basis. *Casciani v. Nesbitt*, 392 Fed. App'x 887, 888 (2d Cir. 2010). Different treatment alone is not sufficient to state a claim, as "equal protection does not require that all evils of the same genus be eradicated or none at all." *Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir. 1995) (citation omitted). For either claim, the different treatment must be intentional. *33 Seminary LLC v. City of Binghamton*, 670 Fed. App'x 727, 729–30 (2d Cir. 2016).

The Court must first address whether a class-of-one claim remains viable in the context of the selection of government contractors. In *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 605 (2008), the Supreme Court foreclosed class-of-one equal protection claims in the public employment context. The Court reasoned that a critical difference exists, "with respect to constitutional analysis, between the government exercising the power to regulate or license, as

13

lawmaker, and the government acting as proprietor, to manage its internal operation." *Id.* at 598 (internal quotations and brackets omitted). Specifically in the context of public employment, the Court noted, government decisions "are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at 604. Therefore, the Court held, "the class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context." *Id.* at 605. In other words, "[a] challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action." *Id.* "[G]overnment offices could not function if every employment decision became a constitutional matter." *Id.* at 607 (citation omitted). The Second Circuit has found that "there may be some circumstances where *Engquist* is properly applied outside of the employment context." *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010).[7]

While the Second Circuit has yet to weigh in directly on the issue, a number of courts in the circuit have found *Engquist*'s bar on class-of-one claims to apply just as forcefully to government contracting as to government employment, given the many similarities between the two. Courts have applied the bar, for example, to a city marshal's claim that he was treated more harshly for alleged criminal conduct than similarly situated marshals, *Airday v. City of N.Y.*, 131 F. Supp. 3d 174, 185 (S.D.N.Y. 2015)[8], a towing company's claim based on the termination of its

---

[7] The Circuit declined to find such circumstances present in that case, in which a state regulatory agency lacked unfettered discretion in how it regulated the existing license of a private clinical testing laboratory.

[8] New York City Marshals, who enforce judgments on behalf of judgment-creditors, are publicly

state license, *JAV Auto Ctr., Inc. v. Behrens*, No. 05-CV-6503 (CS), 2008 WL 9392107, at *5 (S.D.N.Y. Oct. 8, 2008), and a commercial mooring company's termination of its local license, *Seymour's Boatyard, Inc. v. Town of Huntington*, No. 08-CV-3248 (JG), 2009 WL 1514610, at *8 (E.D.N.Y. June 1, 2009), among other public contractor contexts, *see, e.g., E. Amherst Plumbing, Inc. v. Thompson*, No. 12-CV-0195A, 2013 WL 5442263, at *4 (W.D.N.Y. Sept. 27, 2013); *see also Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008) (finding "little trouble" in applying *Engquist* to government contracting based on the broad discretion exercised). *But see Artec Constr.*, 2017 WL 5891817, at *9 (declining to find that *Engquist* barred a housing contractor's claim of *de facto* debarment, based on the defendant's alleged practice of limiting its own discretion in such decisions).

Notably, the Supreme Court has signaled that it views public employment and public contracting similarly in the context of allegations of constitutional violations. For instance, in *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 674–78 (1996), the Court adopted the same First-Amendment-retaliation test for government contractors as for government employees. In doing so, the Court noted that, "[b]ecause of the obvious similarities between government employees and government contractors with respect to this issue, the Court is guided by its government employment precedents." *Id.* at 668. The Court specifically noted that "[t]he government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Id.* at 674. That analysis applies equally well to the equal protection

---

appointed, but are not paid city employees.

issue here and provides further support for applying the restriction of *Engquist* to government contracting. Indeed, those government discretion concerns have even more force here, where the government is evaluating which contractors to hire in the first place.

Plaintiff argues for a distinction based on the notion that selecting which providers provide UPK services implicates the government's role as regulator rather than proprietor. But the Court is not persuaded. Plaintiff has not alleged that Defendants lack *Engquist*'s "discretionary authority based on subjective, individualized assessments" in choosing UPK vendors. 553 U.S. at 602. Defendants' conduct in this case "falls clearly on the proprietary side of the 'crucial' divide between the government 'bring[ing] its sovereign power to bear on citizens at large' and the government as proprietor." *Seymour's Boatyard*, 2009 WL 1514610, at *8 (alteration in original) (quoting *Engquist*, 553 U.S. at 598–99). The Court thus agrees that the reasoning of *Engquist* fits government contracting nearly as well as it does government employment, and therefore bars the class-of-one equal protection claim brought here.

Turning next to the selective enforcement claim,[9] even assuming that Plaintiff is "similarly situated in all material respects" to other vendors it alleges to have criminal histories, *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011) (quotation omitted), Plaintiff has not plausibly alleged that Defendants relied on an impermissible consideration, bad faith, or malicious intent in denying it UPK contracts. Plaintiff again conflates

---

[9] It is not clear whether selective enforcement claims in the public employment context—and therefore arguably in the government contractor context—have survived *Engquist*, see *Emmerling v. Town of Richmond*, 434 Fed. App'x 10, 12 (2d Cir. 2011), but the Court will assume for purposes of this ruling that they have.

16

events that occurred over a decade apart to attempt to demonstrate Defendants' malicious purpose. The strongest evidence of animus are the comments by Defendant Farina in 2002 concerning Ms. Fan and Mr. Shen, Sr.—a year before Plaintiff came into existence. Furthermore, the great bulk of the allegations describe the treatment Plaintiff received at the hands of DOE, not any malicious intent driving the treatment. As stated above, different treatment is not enough. *See Zahra*, 48 F.3d at 684; *Artec*, 2017 WL 5891817, at *11 ("Plaintiff would have this Court find that different treatment is itself proof of a malicious purpose. It is not."). Finally, to the extent that Plaintiff alleges it was singled out because of its speech, the Court has already dismissed Plaintiff's First Amendment claim based on such conduct.

In sum, the Court sees scant allegations that Defendants were motivated by any malicious purpose in exercising discretion to decide which vendors to engage. Plaintiff's leave to amend is therefore denied as futile and its equal protection claims are dismissed with prejudice.

### IV.  Municipal Liability

In light of the Court's determination that Plaintiff has failed to state a viable claim that Defendants violated its constitutional rights, the Court finds that Plaintiff has not stated a claim that any municipal entity was responsible for a violation. *See Monell v. Dept' of Soc. Servs.*, 436 U.S. 658, 690 (1978).

### V.  Injunctive Relief

Because Plaintiff has not adequately stated a claim on any cause of action, it cannot satisfy the requirements for injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiff's request for injunctive relief is therefore denied.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted in its entirety, Plaintiff's request for injunctive relief is denied, and Plaintiff's motion to amend is denied as futile. The Clerk of Court is respectfully directed to terminate docket entries 20 and 29 and close this case.

SO ORDERED.

Dated:   September 6, 2018
         New York, New York

_____
Ronnie Abrams
United States District Judge